Jennifer Pafiti (SBN 282790)
**POMERANTZ LLP**
468 North Camden Drive
Beverly Hills, CA 90210
Telephone: (310) 285-5330
E-mail: jpafiti@pomlaw.com

Jeremy A. Lieberman
J. Alexander Hood II
C. Dov Berger
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
E-mail: jalieberman@pomlaw.com
ahood@pomlaw.com
cdberger@pomlaw.com

Patrick V. Dahlstrom
**POMERANTZ LLP**
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
E-mail: pdahlstrom@pomlaw.com

***Attorneys for Plaintiff***

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JEFFREY GALERMAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>AVALANCHE BIOTECHNOLOGIES, INC., THOMAS W. CHALBERG, JR., and LINDA C. BAIN,<br><br>Defendants | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff Jeffrey Galerman ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint the following upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Avalanche Biotechnologies, Inc. ("Avalanche" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Defendants' (defined below) public documents and press releases; and (c) information readily obtainable on the Internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all persons and entities, other than Defendants, who purchased Avalanche securities: (1) pursuant and/or traceable to the Company's Registration Statement and Prospectus (defined below) issued in connection with the Company's initial public offering on or about July 31, 2014 (the "IPO" or the "Offering"); and/or (2) on the open market between July 31, 2014 and June 15, 2015, both dates inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of the Securities Act of 1933 (the "Securities Act") and under the Securities Exchange Act of 1934 (the "Exchange Act") (the "Class").

2. Avalanche is a biotechnology company that uses its proprietary Ocular BioFactory™ platform for discovering and developing novel medicines with the potential to offer therapeutic benefit. Avalanche's focus is to develop treatment to combat Age-Related Macular Degeneration ("AMD") which is a progressive disease affecting the retinal cells in the macula, the region of the eye responsible for central vision. Wet AMD is the advanced form of AMD where blood vessels invade the cellular

space between layers of cells in the retina. These blood vessels can leak which results in fluid and blood in the retina causing vision loss.

3. Avalanche is developing and studying its lead product, AVA-101, which is a single subretinal injection to treat Wet AMD. It is designed to inhibit the formation of new blood vessels and reduce vascular permeability. Avalanche recently completed Phase 2a of its clinical study for AVA-101.

**JURISDICTION AND VENUE**

4. The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa).

6. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the alleged Defendant Avalanche maintains its principal executive offices is in this District.

7. In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

8. Plaintiff purchased Avalanche securities during the Class Period and has suffered damages as set forth in the accompanying certification.

9. Avalanche is a Delaware corporation with its principal executive offices located at 1035 O'Brien Drive, Suite A, Menlo Park, California 94025. During the Class Period, the Company's stock was traded on the NASDAQ Global Select Market ("NASDAQ") under the symbol "AAVL."

10. Defendant Thomas W. Chalberg, Jr. ("Chalberg") has served as the Company's Chief Executive Officer ("CEO") during all relevant times.

11. Defendant Linda C. Bain ("Bain") has served as the Company's Chief Financial Officer ("CFO") during all relevant times.

12. Defendants Chalberg and Baim are collectively referred to hereinafter as the "Individual Defendants."

13. Defendants Avalanche, Chalberg, and Bain are collectively referred to hereinafter as "Defendants."

14. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and

(f) approved or ratified these statements in violation of the federal securities laws.

15. As officers, directors, and controlling persons of a publicly-held company whose securities are and were registered with the SEC pursuant to the Exchange Act, and were traded on

NASDAQ and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's business prospects and operations, and to correct any previously-issued statements that had become materially misleading or untrue to allow the market price of the Company's publicly-traded stock to reflect truthful and accurate information.

16. Avalanche is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

17. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Avalanche under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### Background

18. On June 30, 2014, Avalanche filed a registration statement on Form S-1 with the SEC in connection with the IPO. The registration statement was amended for the final time when the Company filed an amended Form S-1/A with the SEC on July 31, 2014 (collectively, the "Registration Statement").

19. The Registration Statement contained a preliminary prospectus. The final prospectus (the "Prospectus") was filed with the SEC on July 31, 2014.

20. On July 30, 2014, after market close, the SEC declared the Registration Statement effective.

21. On July 31, 2014, the Company completed its IPO and sold 6,000,000 shares at $17 per share. The Offering raised $102 million in proceeds for the Company.

**Defendants' Materially False and Misleading Statements**

22. The Registration Statement was declared effective on July 30, 2014 and stated in relevant part:

> ***Clinical Development for AVA-101***
>
> We initiated the Phase 2a portion of this trial in 32 subjects in August 2012. The trial design is similar to the Phase 1 trial. This portion of the study included subjects with less advanced disease compared to the Phase 1 subjects, including less extensive scarring and visual acuity up to 20/30. Subjects were randomized 2:1 to high dose AVA-101 and control with similar ramp up and re-treatment criteria as in the Phase 1 portion. ***The primary endpoint is safety and secondary endpoints include retinal thickness, visual acuity and the need for rescue injections with anti-VEGF therapy (Lucentis). The trial is fully enrolled and we expect to report top-line data in mid-2015.***
>
> (emphasis added)

23. The Registration Statement was signed by Defendants Chalberg and Bain.

24. On July 31, 2014, Avalanche filed the Prospectus with the SEC, which forms part of the Registration Statement and states in relevant part:

> ***Clinical Development for AVA-101***
>
> We initiated the Phase 2a portion of this trial in 32 subjects in August 2012. The trial design is similar to the Phase 1 trial. This portion of the study included subjects with less advanced disease compared to the Phase 1 subjects, including less extensive scarring and visual acuity up to 20/30. Subjects were randomized 2:1 to high dose AVA-101 and control with similar ramp up and re-treatment criteria as in the Phase 1 portion. ***The primary endpoint is safety and secondary endpoints include retinal thickness, visual acuity and the need for rescue injections with anti-VEGF therapy (Lucentis). The trial is fully enrolled and we expect to report top-line data in mid-2015.***
>
> (emphasis added)

25. On August 5, 2014, Avalanche issued the press release entitled, "Avalanche Biotechnologies Announces Closing of Initial Public Offering and Exercise of Underwriters' Option to

Purchase Additional Shares." The press release discussed Phase 2a of the AVA-101 study, stating in relevant part:

> ***Avalanche's lead product, AVA-101, is currently under development in a Phase 2a trial for wet age-related macular degeneration.*** Avalanche's Ocular BioFactoryTM platform technology is a proprietary adeno-associated virus (AAV)-based gene therapy discovery and development technology optimized for ophthalmology that utilizes a directed evolution approach to generate novel drug candidates.
>
> (emphasis added)

26. On September 11, 2014, Avalanche issued the press release entitled, "Avalanche Biotechnologies, Inc. Reports Second Quarter 2014 Financial Results." The press release discussed Phase 2a of the AVA-101 study, stating in relevant part:

> Avalanche is a clinical-stage biotechnology company focused on discovering and developing novel gene therapies to transform the lives of patients with sight-threatening ophthalmic diseases. ***Avalanche's lead product, AVA-101, is currently under development in a Phase 2a trial for wet AMD.*** Avalanche's Ocular BioFactory™ platform technology is a proprietary adeno-associated virus (AAV)-based gene therapy discovery and development technology optimized for ophthalmology that utilizes a directed evolution approach to generate novel drug candidates.
>
> (emphasis added).

27. On September 12, 2014, Avalanche filed a Form 10-Q for the second quarter of 2014 ending June 30, 2014 (the "2Q14 10-Q") with the SEC, which was signed by Defendant Bain. The 2Q14 10-Q discussed Phase 2a of the AVA-101 study, stating in relevant part:

> ***We are currently conducting a Phase 2a trial for AVA-101 in wet AMD, with top-line data expected in mid-2015.***
>
> (emphasis added).

28. On September 19, 2014, Avalanche issued the press release entitled, "Avalanche Biotechnologies to Present at the NewsMakers in the Biotech Industry Conference." The press release discussed Phase 2a of the AVA-101 study, stating in relevant part:

> Avalanche is a clinical-stage biotechnology company focused on discovering and developing novel gene therapies to transform the lives of patients with sight-threatening ophthalmic diseases. ***Avalanche's lead product, AVA-101, is currently under development in a Phase 2a trial for wet AMD***. Avalanche's Ocular BioFactory™ platform technology is a proprietary adeno-associated virus (AAV)-based gene therapy discovery and development technology optimized for ophthalmology that utilizes a directed evolution approach to generate novel drug candidates.
>
> (emphasis added).

29. On September 23, 2014, Avalanche issued the press release entitled, "Avalanche Biotechnologies, Inc., Appoints Industry Leader Roman G. Rubio, M.D., as Senior Vice President and Head of Translational Medicine." The press release discussed Phase 2a of the AVA-101 study, stating in relevant part:

> Founded in 2006, Avalanche Biotechnologies, Inc. is a clinical-stage biotechnology company focused on discovering and developing novel gene therapies to transform the lives of patients with sight-threatening ophthalmic diseases. ***Avalanche's lead product, AVA-101, is currently under development in a Phase 2a trial for wet age-related macular degeneration.*** Avalanche's Ocular BioFactoryTM platform technology is a proprietary adeno-associated virus (AAV)-based gene therapy discovery and development technology optimized for ophthalmology that utilizes a directed evolution approach to generate novel drug candidates.
>
> (emphasis added).

30. On October 1, 2014, Avalanche issued the press release entitled, "Avalanche Biotechnologies to Participate in Gene Therapy Panel at the BIO Investor Forum." The press release discussed Phase 2a of the AVA-101 study, stating in relevant part:

> Avalanche is a clinical-stage biotechnology company focused on discovering and developing novel gene therapies to transform the lives of patients with sight-threatening ophthalmic diseases. ***Avalanche's lead product, AVA-101, is currently under development in a Phase 2a trial for wet AMD.*** Avalanche's Ocular BioFactory™ platform technology is a proprietary adeno-associated virus (AAV)-based gene therapy discovery and development technology optimized for ophthalmology that utilizes a directed evolution approach to generate novel drug candidates.
>
> (emphasis added).

31. On October 9, 2014, Avalanche issued the press release entitled, "Avalanche Biotechnologies to Present at the Ophthalmology Innovation Summit at the American Academy of Ophthalmology 2014 Annual Meeting." The press release discussed Phase 2a of the AVA-101 study, stating in relevant part:

> Avalanche is a clinical-stage biotechnology company focused on discovering and developing novel gene therapies to transform the lives of patients with sight-threatening ophthalmic diseases. ***Avalanche's lead product, AVA-101, is currently under development in a Phase 2a trial for wet AMD***. Avalanche's Ocular BioFactory™ platform technology is a proprietary adeno-associated virus (AAV)-based gene therapy discovery and development technology optimized for ophthalmology that utilizes a directed evolution approach to generate novel drug candidates.
>
> (emphasis added).

32. On October 30, 2014, Avalanche issued the press release entitled, "Avalanche Biotechnologies to Participate in Nomura's Biotechnology Conference." The press release discussed Phase 2a of the AVA-101 study, stating in relevant part:

> Avalanche is a clinical-stage biotechnology company focused on discovering and developing novel gene therapies to transform the lives of patients with sight-threatening ophthalmic diseases. ***Avalanche's lead product, AVA-101, is currently under development in a Phase 2a trial for wet AMD***. Avalanche's Ocular BioFactory™ platform technology is a proprietary adeno-associated virus (AAV)-based gene therapy discovery and development technology optimized for ophthalmology that utilizes a directed evolution approach to generate novel drug candidates.
>
> (emphasis added).

33. On November 12, 2014, Avalanche filed a Form 10-Q for the third quarter of 2014 ending September 30, 2014 (the "3Q14 10-Q") with the SEC, which was signed by Defendant Bain. The 3Q14 10-Q discussed Phase 2a of the AVA-101 study, stating in relevant part:

> ***We expect to receive top-line data from this ongoing Phase 2a trial in mid-2015***.
>
> (emphasis added)

34. On November 12, 2014, Avalanche issued the press release entitled, "Avalanche Biotechnologies, Inc. Reports Third Quarter 2014 Financial Results." The press release discussed Phase 2a of the AVA-101 study, stating in relevant part:

> MENLO PARK, Calif., Nov. 12, 2014 (GLOBE NEWSWIRE) -- Avalanche Biotechnologies, Inc. (Nasdaq:AAVL), a clinical-stage biotechnology company focused on discovering and developing novel gene therapies to transform the lives of patients with sight-threatening ophthalmic diseases, today reported financial results and operational highlights for the quarter ended September 30, 2014.
>
> "The third quarter of 2014 marked important progress in the history of Avalanche as a leader in the development of gene therapies for diseases of the eye," said Thomas W. Chalberg, Jr., Ph.D., Chief Executive Officer of Avalanche. "***The successful completion of our initial public offering substantially strengthened our balance sheet and provides the financial resources to advance the development of our portfolio of gene therapy candidates including AVA-101, which is in a Phase 2a clinical trial for the treatment of patients with wet age-related macular degeneration***. Further, we continue to innovate across the full range of our pipeline, including partnered work in rare genetic diseases of the eye and fundamental Avalanche technology advances with the development of novel vectors and methods of administration."
>
> * * *
>
> Avalanche is a clinical-stage biotechnology company focused on discovering and developing novel gene therapies to transform the lives of patients with sight-threatening ophthalmic diseases. ***Avalanche's lead product, AVA-101, is currently under development in a Phase 2a clinical trial for wet AMD.*** Avalanche's Ocular BioFactory(TM) platform technology is a proprietary adeno-associated virus (AAV)-based gene therapy discovery and development technology optimized for ophthalmology that utilizes a directed evolution approach to generate novel drug candidates.
>
> (emphasis added).

35. On November 13, 2014, Avalanche issued the press release entitled, "Avalanche Biotechnologies to Present at the Jefferies Global Healthcare Conference." The press release discussed Phase 2a of the AVA-101 study, stating in relevant part:

> Avalanche is a clinical-stage biotechnology company focused on discovering and developing novel gene therapies to transform the lives of

> patients with sight-threatening ophthalmic diseases. ***Avalanche's lead product, AVA-101, is currently under development in a Phase 2a trial for wet AMD***. Avalanche's Ocular BioFactory™ platform technology is a proprietary adeno-associated virus (AAV)-based gene therapy discovery and development technology optimized for ophthalmology that utilizes a directed evolution approach to generate novel drug candidates.
>
> (emphasis added).

36. On November 26, 2014, Avalanche issued the press release entitled, "Avalanche Biotechnologies to Present at the 26th Annual Piper Jaffray Healthcare Conference." The press release discussed Phase 2a of the AVA-101 study, stating in relevant part:

> Avalanche is a clinical-stage biotechnology company focused on discovering and developing novel gene therapies to transform the lives of patients with sight-threatening ophthalmic diseases. ***Avalanche's lead product, AVA-101, is currently under development in a Phase 2a trial for wet AMD***. Avalanche's Ocular BioFactory™ platform technology is a proprietary adeno-associated virus (AAV)-based gene therapy discovery and development technology optimized for ophthalmology that utilizes a directed evolution approach to generate novel drug candidates.
>
> (emphasis added).

37. On January 5, 2015, Avalanche issued the press release entitled, "Avalanche Biotechnologies Announces Proposed Public Offering of Common Stock and Partial Release of Lock-Up Agreements in Connection Therewith." The press release mentioned Phase 2a of the AVA-101 study stating in relevant part:

> Founded in 2006, Avalanche Biotechnologies, Inc. is a clinical-stage biotechnology company focused on discovering and developing novel gene therapies to transform the lives of patients with sight-threatening ophthalmic diseases. ***Avalanche's lead product, AVA-101, is currently under development in a Phase 2a trial for wet age-related macular degeneration***. Avalanche's Ocular BioFactory™ platform technology is a proprietary adeno-associated virus (AAV)-based gene therapy discovery and development technology optimized for ophthalmology that utilizes a directed evolution approach to generate novel drug candidates.
>
> (emphasis added).

38. On January 8, 2015, Avalanche issued the press release entitled, "Avalanche Biotechnologies Prices Public Offering of $141.6 Million of Common Stock." The press release mentioned Phase 2a of the AVA-101 study stating in relevant part:

> Founded in 2006, Avalanche Biotechnologies, Inc. is a clinical-stage biotechnology company focused on discovering and developing novel gene therapies to transform the lives of patients with sight-threatening ophthalmic diseases. ***Avalanche's lead product, AVA-101, is currently under development in a Phase 2a trial for wet age-related macular degeneration***. Avalanche's Ocular BioFactoryTM platform technology is a proprietary adeno-associated virus (AAV)-based gene therapy discovery and development technology optimized for ophthalmology that utilizes a directed evolution approach to generate novel drug candidates.
>
> (emphasis added).

39. On February 25, 2015, Avalanche issued the press release entitled, "Avalanche Biotechnologies to Present at Upcoming Investor Conferences." The press release discussed Phase 2a of the AVA-101 study, stating in relevant part:

> Avalanche is a clinical-stage biotechnology company focused on discovering and developing novel gene therapies to transform the lives of patients with sight-threatening ophthalmic diseases. A***valanche's lead product, AVA-101, is currently under development in a Phase 2a trial for wet age-related macular degeneration***. Avalanche's Ocular BioFactory™ platform technology is a proprietary adeno-associated virus (AAV)-based gene therapy discovery and development technology optimized for ophthalmology that utilizes a directed evolution approach to generate novel drug candidates.
>
> (emphasis added).

40. On March 5, 2015, Avalanche filed a Form 10-K for the fiscal year ending December 31, 2014 (the "2014 10-K") with the SEC, which was signed by Defendants Chalberg and Bain. The 2014 10-K discussed Phase 2a of the AVA-101 study, stating in part:

> ***We initiated the Phase 2a portion of this trial in 32 subjects in August 2012.*** The trial design is similar to the Phase 1 trial. This portion of the study included subjects with less advanced disease compared to the Phase 1 subjects, including less extensive scarring and visual acuity up to 20/30. Subjects were randomized 2:1 to high dose AVA-101 and control with similar ramp up and re-treatment criteria as in the Phase 1 portion. The

> primary endpoint is safety and ***secondary endpoints include retinal thickness, visual acuity and the need for rescue injections with anti-VEGF therapy (Lucentis)***. The trial is fully enrolled and we expect to report top-line data in mid-2015.
>
> (emphasis added).

41. On March 5, 2015, Avalanche issued the press release entitled, "Avalanche Biotechnologies, Inc. Reports Fourth Quarter and Fiscal 2014 Financial Results." The press release discussed Phase 2a of the AVA-101 study, stating in relevant part:

> MENLO PARK, Calif., March 5, 2015 (GLOBE NEWSWIRE) -- Avalanche Biotechnologies, Inc. (Nasdaq:AAVL), a clinical-stage biotechnology company focused on discovering and developing novel gene therapies to transform the lives of patients with sight-threatening ophthalmic diseases, today reported financial results for the fourth quarter and year ended December 31, 2014.
>
> "***2014 was an important year marked by many significant milestone achievements, including completing enrollment of our Phase 2a clinical trial of our lead product candidate AVA-101, which we believe could be a transformative therapy for wet AMD patients***; embarking on an R&D collaboration with Regeneron; adding key senior management team members to help us execute on our plans; and completing our initial public offering," said Thomas W. Chalberg, Jr., Ph.D., Founder and Chief Executive Officer. "We have the team and necessary financial resources, including from our recently completed follow-on offering, to make 2015 another year of major milestone achievement and progress, ***including one-year follow-up results from our Phase 2a clinical trial in the middle of the year***, initiation of a Phase 2b trial in the second half of the year and advancement of additional product candidates from our BioFactory™ platform to advance our leadership in gene therapy for ophthalmic diseases and deepen our proprietary product pipeline."
>
> * * *
>
> Avalanche is a clinical-stage biotechnology company focused on discovering and developing novel gene therapies to transform the lives of patients with sight-threatening ophthalmic diseases. ***Avalanche's lead product, AVA-101, is currently under development in a Phase 2a clinical trial for wet age-related macular degeneration***. Avalanche's Ocular BioFactoryTM platform technology is a proprietary adeno-associated virus (AAV)-based gene therapy discovery and development technology optimized for ophthalmology that utilizes a directed evolution approach to generate novel drug candidates

(emphasis added).

42. On March 16, 2015, Avalanche published its Corporate Presentation. The Corporate Presentation incorporated information regarding Phase 2a of the AVA-101 study including the following slides:





## Product Pipeline Addresses Validated Targets for Both Large and Orphan Markets

| Product Candidate | Indication | Stage of Development: Research | Stage of Development: Preclinical | Stage of Development: Phase 1/2 | Near-Term Milestones | Worldwide Commercial Rights |
|---|---|---|---|---|---|---|
| AVA-101 | Wet AMD | | | | Top-line phase 2a data expected mid-2015<br>IND filing 2H 2015 | Avalanche |
| AVA-101 | DME, RVO | | | | IND-enabling studies planned for 2015 | Avalanche |
| AVA-201 | Wet AMD (prevention) | | | | Preclinical studies in 2015 | Avalanche |
| AVA-311 | XLRS | | | | | Regeneron; Avalanche receives milestones and royalties and has an option to share development costs and profits |

- Active R&D programs to expand pipeline

7

AVALANCHE BIOTECH



## AVA-101: Product Overview

**Potential for One-Time Transformative Treatment**
- One-time, subretinal injection offers "durable remission" of wet AMD
- AAV2 vector containing gene encoding sFlt-1, a naturally occurring VEGF inhibitor, administered directly to retina cells

**Promising Clinical Data**
- Phase 1 well tolerated with no drug-related adverse events
- Subjects gained/maintained vision with no or minimal need for additional treatment over one year

**Significant Market Opportunity**
- Wet AMD is a leading cause of vision loss that affects three million people worldwide with over $6B sales
- Compliance with existing treatments is challenging and longer-lasting treatment is a major unmet need

**Progress**
- Phase 2a trial fully enrolled in Australia; data expected mid-2015
- Phase 2b in the U.S. planned for 2H 2015

9

AVALANCHE BIOTECH

## AVA-101 Has Clear Regulatory Path to Approval




- Phase 2a data mid-2015:
  - Further establish safety
  - Inform development plan
- Phase 2b for wet AMD expected to begin 2H-2015
  - Multi-center, randomized, dose-ranging study in U.S.
  - Commercially scalable manufacturing
  - Evaluate impact on vision and need for any rescue injections
- Clear endpoints established for regulatory approval
  - Visual acuity at 12 months (superiority and non-inferiority paths are established)
  - AVA-101 has the potential to re-define success both in terms of vision maintenance and reduced burden of treatment

21

AVALANCHE BIOTECH

## 2014 and 2015 Milestone Events

| 2014 | 2015 |
|---|---|
| ☑ Commenced Regeneron collaboration | ☐ AVA-101 Phase 2a data |
| ☑ Completed $117M IPO and $55M Series B Financing | ☐ AVA-101 US IND filing |
| ☑ Completed AVA-101 Phase 2a enrollment | ☐ AVA-101 Phase 2b first patient in |
| ☑ Manufactured AVA-101 Phase 2b clinical drug substance | ☐ R&D pipeline update |
| ☑ Completed in-life portion of NHP toxicology and biodistribution study | ☐ Clinical publications |

31

AVALANCHE BIOTECH




43. On May 13, 2015, Avalanche filed a Form 10-Q for the first quarter of 2015 ending March 30, 2015 (the "1Q15 10-Q") with the SEC, which was signed by Defendant Bain. The 1Q15 10-Q discussed Phase 2a of the AVA-101 study, stating in relevant part:

> ***We expect to receive top-line data from this ongoing Phase 2a trial in mid-2015.***
>
> (emphasis added)

44. On May 13, 2015, Avalanche issued the press release entitled, "Avalanche Biotechnologies, Inc. Reports First Quarter 2015 Financial Results." The press release discussed Phase 2a of the AVA-101 study, stating in relevant part:

> MENLO PARK, Calif., May 13, 2015 (GLOBE NEWSWIRE) -- Avalanche Biotechnologies, Inc. (Nasdaq:AAVL), a clinical-stage biopharmaceutical company committed to improving or preserving the sight of people suffering from blinding eye diseases with an unmet

> medical need, today reported financial results for the first quarter ended March 31, 2015.
>
> "The start of 2015 marked important milestones for Avalanche as we continue to advance our pipeline and innovate in next-generation vector technology," said Thomas W. Chalberg, Jr., Ph.D., founder and chief executive officer. "We're proud to collaborate with the University of Washington and vision scientists Drs. Jay and Maureen Neitz as we develop AVA-322 and AVA-323, our gene therapy product candidates for red-green color blindness. ***Combined with our anticipated mid-year announcement of 12-month topline data from the Phase 2a trial and 36-month follow-up from the Phase 1 trial of AVA-101 – our lead product candidate – and initiation of a Phase 2b trial, we're looking forward to continued progress in our work to transform the treatment landscape for patients with sight-threatening eye diseases***."
>
> (emphasis added).

45. On May 14, 2015, Avalanche issued the press release entitled, "Avalanche Biotechnologies Presents Three Posters at American Society of Gene & Cell Therapy (ASGCT) Annual Meeting." The press release discussed Phase 2a of the AVA-101 study stating in relevant part:

> MENLO PARK, Calif., May 14, 2015 (GLOBE NEWSWIRE) -- Avalanche Biotechnologies, Inc. (Nasdaq:AAVL), a clinical-stage biopharmaceutical company committed to improving or preserving the sight of people suffering from blinding eye diseases with an unmet medical need, ***announced that three posters, including one providing baseline demographics and characteristics from its Phase 2a clinical trial for AVA-101, will be presented at the American Society of Gene & Cell Therapy(ASGCT) 18th Annual Meeting in New Orleans***.
>
> AVA-101 (rAAV.sFlt-1) is being developed as a single treatment to provide a safe and effective therapy for wet age-related macular degeneration (wet AMD) that is durable and reduces the need for frequent anti-VEGF injections. ***The Phase 2a clinical trial is currently ongoing to evaluate the safety of a single injection of rAAV.sFlt-1 in subjects with wet AMD. Twelve-month data from the study and 36-month follow-up from the Phase 1 trial are expected mid-year.***
>
> The poster, entitled, "**Baseline Data for Patients Participating in the Phase 2a rAAV.sFlt-1 Gene Therapy Trial for Exudative Age-Related Macular Degeneration"** will be presented by Elizabeth P. Rakoczy, PhD, Winthrop Professor of Molecular Ophthalmology at the University of Western Australia, on Thursday, May 14 from 5:30 – 7:00 p.m. CT.1 A summary is below:

- Enrolled subjects are representative of the wet AMD population under current treatment with anti-VEGF therapy with variable visual acuity and prior treatment. Subjects were randomized 2:1 to receive a single sub-retinal injection of 1E11 vg rAAV.sFlt-1 or 0.5 mg ranibizumab alone.
- The mean age of the subjects is 79 ± 7; median visual acuity was 63 ETDRS letters.
- The median number of previous anti-VEGF injections for non-naïve patients is 10, with three of the 32 subjects being treatment naïve.

(emphasis added).

46. The statements contained in ¶¶ 22-45 were materially false and/or misleading when made because Defendants failed to disclose or indicate that Phase 2a of the AVA-101 study was not designed to show any statistical significance between the active and control groups in the secondary endpoints.

**THE TRUTH EMERGES**

47. After the market closed on June 15, 2015, the Company issued a press release entitled, "Avalanche Biotechnologies, Inc. Announces Positive Top-Line Phase 2a Results for AVA-101 in Wet Age-Related Macular Degeneration." The press release stated in relevant part:

> MENLO PARK, CA -- (Marketwired) -- 06/15/15 –
> -Phase 2a study met primary endpoint while demonstrating promising treatment effect on visual acuity maintenance with less frequent injections
> - Phase 1 36-month follow-up data demonstrates continued safety and tolerability; rescue injections averaged less than one per year
> - Conference call and webcast today at 5:00 p.m. ET
>
> Avalanche Biotechnologies, Inc. (NASDAQ: AAVL) today announced that its Phase 2a clinical study for AVA-101 met its 12-month primary endpoint, based on ophthalmic and systemic safety, demonstrating that AVA-101 was well tolerated with a favorable safety profile in subjects with wet age-related macular degeneration (wet AMD). AVA-101 also showed an improvement on best corrected visual acuity (BCVA) compared with the control group and a positive trend in response rate (stable vision with few rescue injections). AVA-101 is being developed as a sub-retinal gene therapy injection to provide a safe and effective treatment for wet AMD that is durable and reduces the need for frequent anti-VEGF injections.

“The results of this study confirm the Phase 1 safety results and suggest that AVA-101 could potentially benefit a significant portion of patients with wet AMD who require regular treatment with anti-VEGF therapy," said Samuel B. Barone, M.D., Avalanche's chief medical officer. "The current standard of care in wet AMD requires frequent anti-VEGF injections, which present a significant burden for patients and their caregivers, and can result in reduced treatment compliance and under-treatment. Therefore, a product that can maintain or improve vision while reducing the number of treatment injections would represent a powerful new option for patients and physicians.”

In the study, BCVA mean change from baseline showed a difference of 11.5 letters between the treatment (+2.2 letters) and control (-9.3 letters) groups (95 percent CI, 2.3-20.7 letters). Additionally, a significant number of AVA-101 treated subjects (42.9 percent) improved or maintained stable vision with two or fewer rescue injections compared with subjects in the control group (9.1 percent). Importantly, BCVA improvement of at least 10 letters with two or fewer rescue injections was observed in 23.8 percent of treated subjects and 0 percent of subjects in the control group.

“AVA-101 demonstrated tolerability and a promising treatment effect in the subjects treated in this study, many of whom had been extensively treated with anti-VEGF therapy prior to enrollment and showed difficult-to-treat characteristics including persistent recurrent wet AMD activity,” said Thomas W. Chalberg, Jr., Ph.D., Avalanche's co-founder and chief executive officer. “These data will help inform our future study designs, including the Phase 2b study that we plan to initiate later this year. We believe AVA-101 has the potential to substantially improve the standard of care and lower the high burden of treatment for patients suffering from wet AMD.”

The Phase 2a study enrolled 32 subjects age 55 or older with wet AMD and randomized them to an AVA-101 treatment group (n=21) or a control group (n=11). Subjects in both groups received two ranibizumab injections at day 0 and week 4, and ranibizumab rescue therapy was allowed according to pre-specified criteria beginning at week 8. Twenty-nine of 32 subjects had received prior anti-VEGF therapy, with a median of 10 prior injections.(1) The primary endpoint of the study was safety, as measured by ophthalmic and/or systemic complications. Secondary endpoints included mean change from baseline in BCVA, the number of ranibizumab rescue injections, and mean change from baseline in central retinal thickness as measured by SD-OCT. All subjects remained in the study through the 12-month study visit.

No serious adverse events related to AVA-101 were observed. One subject in the treatment group experienced a non-fatal myocardial infarction classified as unrelated to therapy. In the control group, one case of

endophthalmitis was observed. All adverse events related to study drug were mild or moderate and resolved within 60 days. There were no unexpected administration-related adverse events, and any events that occurred resolved without visual sequelae.

***Although the study was not designed to show statistically significant differences between the active and control subjects in the secondary endpoints***, the following results were observed:

-Overall, BCVA mean change from baseline did show a significant difference of 11.5 letters between the treatment (+2.2 letters) and control (-9.3 letters) groups (95 percent CI, 2.3-20.7 letters).
-More AVA-101 treated subjects improved or maintained stable vision (>-5 letters) with a low number (≤2) of rescue treatments. Specifically, 23.8 percent (treated) vs. 9.1 percent (control) maintained stable vision with ≤1 rescue injections, and a significant number of AVA-101 treated subjects (42.9 percent) improved or maintained stable vision with ≤2 rescue injections compared with subjects in the control group (9.1 percent).
-BCVA improvement of ≥10 letters with ≤2 rescue injections was observed in 23.8 percent of treated subjects and 0 percent of subjects in the control group.
-The median number of rescue injections using the protocol-specified retreatment regimen was 2 (95 percent CI, 1-6 injections) in AVA-101 treated subjects compared with 4 (95 percent CI, 3-5 injections) in the control group. More subjects required fewer retreatments in the treatment group compared with control (19.0 percent vs. 9.1 percent with 0 injections; 33.3 percent vs. 9.1 percent with ≤1 injections; 52.4 percent vs. 9.1 percent with ≤2 injections).
-Retinal thickness mean change from baseline, as reported by the site using automated segmentation, was +25 mm for AVA-101 treated subjects compared with -56 mm in the control group (CI for the difference, 17 to 145 mm). Additional evaluation of SD-OCT images by an image reading center are ongoing.

Detailed data from the AVA-101 Phase 2a study will be presented at upcoming medical conferences this year. These data will help inform the design of Avalanche's Phase 2b AVA-101 study, which the Company plans to conduct at multiple centers in the United States.

(emphasis added).

48. On this news, the Company’s stock fell $21.83 per share or over 56% the next day to close at $17.05 per share on June 16, 2015, damaging investors.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

49. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Avalanche securities traded on NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

50. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Avalanche securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Avalanche or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

51. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

52. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

53. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Avalanche;
- whether the Individual Defendants caused Avalanche to issue false and misleading statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;
- whether the prices of Avalanche securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

54. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

55. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Avalanche securities are traded in efficient markets;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on NASDAQ, and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold Avalanche securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

56. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

57. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

58. At all relevant times, the market for Avalanche's securities was an efficient market for the following reasons, among others:

59. As a result of the foregoing, the market for Avalanche's securities promptly digested current information regarding Avalanche from all publicly available sources and reflected such information in Avalanche's stock price. Under these circumstances, all purchasers of Avalanche's securities during the Class Period suffered similar injury through their purchase of Avalanche's securities at artificially inflated prices, and a presumption of reliance applies.

**NO SAFE HARBOR**

60. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many or all of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements

was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

**FIRST CLAIM**
**Violation of Section 10(b) of The Exchange Act**
**and Rule 10b-5 Promulgated Thereunder Against All Defendants**

61. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

62. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Avalanche's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

63. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Avalanche securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

64. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business and future prospects of Avalanche as specified herein.

65. These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Avalanche's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Avalanche and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Avalanche securities during the Class Period.

66. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) the Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's business prospects and operations; (3) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's operations and business projects at all relevant times; and (4) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

67. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect

of concealing the design for the insignificant results for secondary endpoints of the Phase 2a AVA-101 study thereby artificially inflating price of its securities. As demonstrated by Defendants' omissions and misstatements of the Company's business strategy throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

68. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Avalanche securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Avalanche's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Avalanche securities during the Class Period at artificially high prices and were or will be damaged thereby.

69. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the design of the Phase 2a study, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Avalanche securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

70. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

71. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

72. This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

73. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

74. The Individual Defendants acted as controlling persons of Avalanche within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

75. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

76. As set forth above, Avalanche and the Individual Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

77. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

78. This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

**THIRD CLAIM**
**Violation of Section 11 of**
**The Securities Act Against All Defendants**

79. Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

80. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against the Individual Defendants.

81. The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

82. Avalanche is the registrant for the IPO. Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

83. As issuer of the shares, Avalanche is strictly liable to Plaintiff and the Class for the misstatements and omissions.

84. None of the Individual Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

85. By reasons of the conduct herein alleged, each Individual Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

86. Plaintiff acquired Avalanche securities pursuant and/or traceable to the Registration Statement for the IPO.

87. Plaintiff and the Class have sustained damages. The value of Avalanche securities has declined substantially subsequent to and due to the Individual Defendants' violations.

**FOURTH CLAIM**
**Violation of Section 15 of**
**The Securities Act Against Individual Defendants**

88. Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

89. This count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act.

90. Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Avalanche within the meaning of Section 15 of the Securities Act. Individual Defendants had the power and influence and exercised the same to cause Avalanche to engage in the acts described herein.

91. Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

92. By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: July 13, 2015

Respectfully submitted,

**POMERANTZ LLP**

By: *s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone: (310) 285-5330
E-mail: jpafiti@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
C. Dov Berger
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: 212-661-1100
Facsimile: 212-661-8665
E-mail: jalieberman@pomlaw.com
ahood@pomlaw.com
cdberger@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
E-mail: pdahlstrom@pomlaw.com

***Attorneys for Plaintiff***

**CERTIFICATION PURSUANT**
**TO FEDERAL SECURITIES LAWS**

1. I, Jeffrey Galerman, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against Avalanche Biotechnologies, Inc. ("Avalanche" or the "Company"), and authorize the filing of a comparable complaint on my behalf.

3. I did not purchase or acquire Avalanche securities at the direction of plaintiffs counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4. I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Avalanche securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5. To the best of my current knowledge, the attached sheet lists all of my transactions in Avalanche securities during the Class Period as specified in the Complaint.

6. During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7. I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

Jeffrey Galerman

8. I declare under penalty of perjury that the foregoing is true and correct.

**Executed** June 22, 2015
**(Date)**

Jeffrey Galerman
**(Signature)**

Jeffrey Galerman
**(Type or Print Name)**

## SUMMARY OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES | PRICE PER SHARE |
|---|---|---|---|
| 03-27-15 | purchase | 5 | 39.41 |
| 04-13-15 | purchase | 4 | 39.58 |
| 06-16-15 | sold | 9 | 17.80 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |